UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal No. 05-386 (JMR/SRN) |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **ROBERT LEE WILLIAMS,** | |
| **Defendant.** | |

Michael A. Dees, Assistant United States Attorney, on behalf of Plaintiff

Richard H. Kyle, Jr., Esq., on behalf of Defendant

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter comes before the undersigned United States Magistrate Judge on Defendant's Motions to Suppress Statements (Doc. No. 21) and to Suppress Search and Seizure Evidence (Doc. No. 22).[1] The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)(iii)(1).

**I.      BACKGROUND**

On November 11, 2005, an Indictment was returned charging Defendant with possession with intent to distribute approximately 42 grams of a mixture or substance which contained crack cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). (Doc. No. 11.) On December 23, 2005, the Court held oral argument on Defendant's

---

[1] Defendant also brought six nondispositive motions which are addressed by the Court in a separate Order.

1

motions. (Doc. No. 25.) At the close of the hearing, the Court granted the parties leave to submit supplemental briefs and the Court took the matter under advisement after those briefs were submitted, on January 17, 2006. (See Doc. No. 25.) At the motion hearing, the Government presented the testimony of Officer Phillip Sosnowski of the Minneapolis Police Department (MPD) and Agent Randall Olson, also a MPD officer but presently assigned to the Drug Enforcement Agency Task Force in Minneapolis. (Transcript of Dec. 23, 2005 Mot. Hearing, Doc. No. 30 at 4-5, 22.) The Defendant testified on his own behalf. At the hearing, the following exhibits were received:

> Government Exhibit 1: Application for Search Warrant and Supporting Affidavit (both dated October 20, 2005)
>
> Government Exhibit 2: Audio disc of October 25, 2005 Interview of Defendant
>
> Defense Exhibits 1-7: Photographs of the MPD Fourth Precinct Building

(Id. at 4, 8, 34.)

The facts leading up to the Indictment and relevant to the present motions are as follows. In October 2005, officers of the Minneapolis Police Department received anonymous citizen complaints that crack cocaine was being stored and sold at 1404 Newton Ave North, lower unit. (Gov't Ex. 1.) According to the affidavit of police officers, the property is owned by Defendant. (Id.) The officers surveilled the premises on several occasions. (Id.) They observed multiple persons approach the house on foot or by automobile, enter the house, stay a short time, and then exit the building. (Id.) The officers described "[t]his type of heavy foot and vehicular traffic" as "consistent with the presence of narcotics dealing." (Id.) The officers contacted an informant they had used in the past who had previously provided truthful and reliable information leading to the

arrests of suspects of narcotics offenses and the seizure of narcotics.  (Id.)  This informant was searched for contraband, none was found, and then the informant was driven to the suspect house.  (Id.)  The informant approached the house, met the seller/suspect, who the informant knew as "Biggie," on the porch and then Biggie led the informant into the lower unit where the informant purchased a substance believed to be crack cocaine from Biggie.  (Id.)  The informant left the house and returned to the awaiting undercover police.  (Id.)  The suspected crack cocaine field tested positive for cocaine base and weighed approximately 6.8 grams.  (Id.)  The informant told police officers that Biggie usually carried a handgun on his person and conducted illegal drug sales during nighttime hours.  (Id.)

     Based upon the above, the MPD Officers John Hawes, Karen Green, and Phillip Sosnowski swore out a joint affidavit in which they sought a search warrant to search the premises and Defendant for narcotic drugs and controlled substances.  (Id.)  On Thursday, October 20, 2005, Minnesota State District Court Judge Stephen C. Aldrich issued a search warrant to the officers to enter, at anytime and without announcement of authority, the premises at 1404 Newton Ave North, lower unit and to search the "seller/suspect described as a black male, 5'07" to 5'09" tall, dark complexion, short hair, muscular build, 39-44 years old who goes by the street name 'Biggie'" for items including narcotic drugs, controlled substances, drug paraphernalia, monies from the sale of drugs, and firearms.  (Id.)

     On Tuesday, October 25, 2005, during daylight hours and prior to searching Defendant's house, officers of the MPD observed Defendant leaving his house.  (Transcript of Mot. Hearing, Doc. No. 30 at 23.)  They followed Defendant for a number

of blocks and then pulled him over on a busy street. (Id. at 24, 47.) Defendant was patted down for weapons and then handcuffed. (Id. at 24, 28, 58.) None were found. (Id. at 29-30.) Agent Olson testified at the motion hearing that at least one of the officers who patted down Defendant, Hennepin County Deputy Erik Fleck, "found something in [Defendant's] pants; however, short of pulling his pants down on the street and searching for it there was no way of getting it out." (Id. at 30.) Upon cross-examination, Olson stated that he had read Deputy Fleck's report of his involvement in the events of October 25, 2005 and that the report did not describe feeling a bulge in Defendant's pants. (Doc. No. 30 at 32.) Olson testified that an MPD sergeant suggested that Defendant be removed from the scene of the traffic stop to the MPD's Fourth Precinct so that a full search could be conducted. (Id. at 30.) Olson testified that "[a]t the arrest scene he was patted down and the officer felt there was something in his pants; however, because of privacy issues he did not want to go in the pants at that location." (Id. at 24.)

Defendant was placed in a squad car and transported to the Fourth Precinct which was located several blocks from the scene of the traffic stop. (Id. at 32.) He was taken into the rear parking lot of the Fourth Precinct—the parking lot for squad cars and precinct employee vehicles. (Id. at 38-39.) There, in the Fourth Precinct parking lot, Defendant was taken out of the squad car and again searched by Deputy Fleck. (Id. at 40.) A significant part of the testimony of Olson and Defendant centered around the description of the parking lot and Defendant's location in the parking lot when he was searched. Defendant entered into evidence seven pictures, four of which depict the rear parking lot from different vantage points as photographed on December 22, 2005,

4

approximately two months after the date of the search. (Id. at 34-35.) The parking lot is enclosed by the back of the precinct building, a brick wall, and a chain link fence topped with barbed wire. (See Def. Exs. 4-7.) The rear parking lot is bordered by residential housing. (Doc. No. 30 at 36-37.) The parking lot has one gated entrance/exit. (Id. at 47.) There was no testimony as to whether or not the gate was closed during the search of Defendant. The pictures taken by counsel for Defendant on December 22, 2005 show the gate open. (Def. Ex. 5.)

Agent Olson testified that he stood about ten feet from Fleck during the search but "was also being talked to by several cops" during the search. (Id. at 41-42.) Olson testified that the vegetation on the fence surrounding the parking lot was "more thick" at the time of the search than that depicted in the photographs. (Id. at 47.) He stated that there was very thick vegetation on the fence covering nearly every inch of the fence perimeter. (Id. at 48.) He stated that, during the search of Defendant in the parking lot, he saw no cars drive by or people walk by the parking lot. (Id.) Other than Defendant, Olson saw no civilians or nonpolice officers in the parking lot. (Id.) Olson testified that he could not recall what Fleck said to Defendant or if Fleck asked Defendant's permission to conduct the search. (Id. at 41.) Olson testified that Fleck undid Defendant's pants, put his hand into Defendant's pants and inside Defendant's underwear and retrieved a large amount of crack cocaine and powder cocaine from somewhere near Defendant's genitals. (Id. at 24, 40-43.)

Defendant testified that he put the drugs in his pants to hide them in the event he was searched. (Id. at 56.) At the hearing, he marked an "X" on Defendant's Exhibit 5 to mark his location in the parking lot at the time of the search. The location Defendant

marked is near the entrance/exit to the parking lot. (Def. Ex. 5.) Defendant testified that the "parking lot was full when we pulled in there." (Id. at 54.) He stated that he was searched "right where the squad car was parked." (Id.) Upon direct examination, the following exchange occurred between Defendant and his counsel:

> Defendant: The officer got me out of the car, brought me around to the back of the car, they took the cuffs off and he proceeded to search me. He searched me, he went down . . . my arms and he turned me around, he took his hand and went around my waist, his two thumbs was going around my waist and he pulled my pants open and stuck his hand down my privates.
> Counsel: Did you give him permission to do this?
> Defendant: No, I didn't.
> Counsel: Did he ask for permission?
> Defendant: No permission.
> Counsel: Did he unbutton your pants?
> Defendant: No, he ripped the button loose.
> Counsel: Where did his hand go when he went down into your crotch?
> Defendant: Down in my underwear under my testicles.

(Id. at 54-55.) Olson testified that immediately after the search, Defendant was taken into the precinct building where he was later interviewed by Officer Sosnowski. (Id. at 6, 44.) No testimony was provided as to why the search was conducted in the parking lot rather than in the precinct building.

The officers executed a search of the lower unit of 1404 Newton Ave North on Tuesday, October 25, 2005, at 3:00 p.m. (Id.)

Officer Sosnowski testified that he interviewed Defendant for about ten minutes in a small interview room off one of the basement offices "probably a couple of hours" after Defendant had been taken into custody. (Id. at 6.) After preliminary questions about his age, address, and other contact information, Sosnowski read Defendant his Miranda rights. (Gov't Ex. 2.) Defendant agreed to talk with Sosnowski without an

attorney. (Id.) Defendant admitted he had being selling drugs in Minneapolis for over a year and had possessed crack and powder cocaine on his person when he was stopped by police on October 25, 2005. (Id.) On October 26, 2005, based upon an affidavit submitted by Agent Olson, a criminal complaint issued charging Defendant with possession with intent to distribute approximately 40 grams of a mixture or substance which contained crack cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). (Doc. No. 1.) Defendant was later indicted on these charges. (Doc. No. 11.)

## II.     PARTIES' POSITIONS

Defendant moves to suppress the evidence seized from Defendant and the statements he made to police. (Doc. Nos. 21 and 22.) The motions were not accompanied by a memorandum of law prior to the hearing on the motions. The motion to suppress Defendant's statements charges that Defendant received an inadequate Miranda warning or did not voluntarily, knowingly, and intelligently waive his Miranda rights. (Doc. No. 21.) The motion to suppress the evidence seized from Defendant is based on the lack of probable cause within the four corners of the search warrant. (Doc. No. 22.) After the motion hearing, Defendant filed a supplemental memorandum of law in which Defendant's sole basis for suppression of the evidence and his statements is that the search warrant did not authorize the "extreme intrusion" into Defendant's privacy interests that resulted when Deputy Fleck searched Defendant's genital area for drugs. (Def.'s Mem. (Doc. No. 26) at 4-8.)

Specifically, Defendant argues that the Eighth Circuit has held that a warrant to search a drug suspect's "person" is not sufficient to authorize an extremely invasive search such as a body cavity search. (Id. at 5.) Further, Defendant contends that the

7

controlled buy had taken place at least five days prior to the traffic stop, and Defendant was not acting suspicious on the day of the traffic stop, thus, the officers had no probable cause to stop Defendant. (Id.) Moreover, Defendant argues that even if probable cause to search Defendant existed, the search was impermissible because it was conducted in the rear parking lot of the Fourth Precinct. (Id.) Defendant cites to Starks v. City of Minneapolis, 6 F. Supp. 2d 1084 (D. Minn. 1998) (Rosenbaum, J.) in support of his position that the location of the search was unreasonable. (Id. at 6.) Finally, Defendant asserts that, if the Court finds that the search of Defendant which uncovered the crack and powdered cocaine violates the rights guaranteed by the Fourth Amendment, then the subsequent statements made by Defendant which "arose as a direct result of the evidence seized during the public and impermissible body cavity search of his person" must also be suppressed as "fruit of the poisonous tree." (Id. at 8.)

The United States counters that the search warrant for Defendant's person was based on probable cause, Defendant was seen leaving the address of the house listed in the search warrant, and officers suspected Defendant was concealing something in his pants as a result of the initial pat down search for weapons and drugs as authorized by the search warrant. (Gov't Supplemental Response (Doc. No. 29) at 2.) According to the United States, the subsequent search of Defendant in the Fourth Precinct parking lot did not result in exposing Defendant's genitals or pulling down his pants and no civilians were seen observing the search of Defendant's person. (Id. at 3.) The United States argues that, considering the relative seclusion of the parking lot, the manner in which the search was conducted, and the lack of any evidence that anyone other than

the officers in the parking lot witnessed the search created a limited intrusion given the need to conduct the search. (Id. at 5-7.)

### III.   DISCUSSION

####    A.   Motion to Suppress Search and Seizure Evidence (Doc. No. 22)

#####        1.   Four Corners Review of the Affidavit

"Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" whether a showing of probable cause has been met. Illinois v. Gates, 462 U.S. 213, 235 (1983). Rather, "'in dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 231 (citations omitted). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978).

Where a judge "relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999). "Probable cause exists if, based upon a common-sense consideration of all the circumstances set forth in the supporting affidavit, 'there is a fair probability that contraband or evidence of a crime will be found

9

in a particular place.'" United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990) (quoting Gates, 462 U.S. at 238), cert. denied, 498 U.S. 1094 (1991). "The source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." United States v. Humphrey, 140 F.3d 762, 764 (8th Cir. 1998) (citing Gates, 462 U.S. at 243-45).

"In reviewing the sufficiency of an affidavit supporting a search warrant, we accord great deference to the decision of the judicial officer who issued the warrant." United States v. Day, 949 F.2d 973, 977 (8th Cir. 1991). A court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." United States v. Carlson, 697 F.2d 231, 238 (8th Cir. 1983).

To the extent that Defendant challenges the search warrant itself, the Court has reviewed the underlying affidavit (Gov't Ex. 1). The Court finds that the four corners of the affidavit support the issuance of the search warrant for both Defendant's house and his person. Officers observed foot and vehicle traffic consistent with drug activity at Defendant's house. (Id.) A confidential reliable informant bought drugs from Defendant at Defendant's house. (Id.) Further, the Court finds that the delay of approximately five days in executing the state warrant does not alter the validity of the search warrant under the circumstances presented here. Accord Fed. R. Cr. P. 41(e)(2)(A) (stating that federal warrant must state a time for execution no longer than ten days). Therefore, the Court finds that police officers stopped Defendant after they observed him driving away from 1404 Newton Ave North on October 25, 2005 pursuant to a valid search warrant.

(Doc. No. 30 at 23-24.) Thereafter, while conducting a pat down at the traffic stop the police discovered evidence that Defendant was concealing something in his pants. (Id. at 24, 30.) The Court finds that, even if the search warrant for Defendant's person did not give them the authority to search inside Defendant's pants, then probable cause for such a search arose as part of the initial pat down performed by Deputy Fleck.

### 2.     Defendant's Privacy Interests

"The Fourth Amendment prohibits only unreasonable searches." Thomsen v. Ross, 368 F. Supp. 2d 961, 970 (D. Minn. 2005) (citing Goff v. Nix, 803 F.2d 358, 363 (8th Cir.1986), cert. denied, 484 U.S. 835 (1987)). The lawfulness of a strip search depends on whether the circumstances reasonably justify such an intrusive invasion of privacy. Bell v. Wolfish, 441 U.S. 520, 559 (1979). In determining the reasonableness of a particular search, a court must assess the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id.

Here, there can be little doubt that officers were justified in initiating the search of Defendant's person. A valid search warrant authorized the search of Defendant's person for narcotics and it was timely executed. "It is common knowledge that controlled substances are often concealed on the person of users and dealers alike." Burns v. Loranger, 907 F.2d 233, 238-39 (1st Cir. 1990). Upon patting down Defendant pursuant to the search warrant, Deputy Fleck felt something suspicious in the front of Defendant's pants. (Doc. No. 30 at 24, 30.) This gave the officers probable cause to conduct a further search and they removed Defendant to a more private location to conduct that subsequent search (Id. at 24, 30).

Further, the search was not a typical strip search that involves the removal of clothing and visual inspection of bare skin. Defendant's clothing was not removed. Nor was the search as prolonged as a typical strip search which would involve the removal of layers of clothing. While no time estimate for the search was given, the evidence presented shows that Deputy Fleck opened Defendant's pants, reached inside his underwear, searched Defendant's genitalia and found drugs near Defendant's genitalia. (See id. at 40-43.) Such a search would be short in duration. Moreover, the scope of the search, while involving the most intimate of areas, appears to have been limited to reaching a hand into the same location that the same Deputy noticed had a protrusion at the traffic stop pat down, recovering drugs from that area, and withdrawing the hand. (See id.) No evidence has been presented that shows Defendant's private parts were visually inspected or even that such an inspection would have been possible given the manner of the search. Nor does the record contain any evidence that the search extended beyond the limited area which had been identified as suspicious during the initial pat down conducted pursuant to a valid search warrant.

That the search was conducted in a parking lot rather than indoors troubles the Court but the location of the search must be analyzed in the context of the other factors discussed in Bell. Despite being yards from the precinct building, officers made the decision to search Defendant outside the station in the parking lot. (See id. at 44.) Defendant cites Starks, a decision issued by the presiding district court judge in this case, the Honorable District Court Judge James M. Rosenbaum, in support of Defendant's contention that the parking lot search was unreasonable. (Def.'s Mem. at 6-7.) Starks was a civil action where the female plaintiff had been a passenger in a car

12

stopped by the MPD on a busy highway for a license plate problem. Starks, 6 F. Supp. 2d at 1086. The officers making the stop claimed they smelled the odor of burnt marijuana, conducted an initial pat down of the plaintiff and found nothing, but later overheard plaintiff tell her companion that the police did not find "it." Id. Based upon this statement, a female officer on the scene took plaintiff to an area some distance away from the stopped vehicles, behind a tree, but within restricted sight of a busy intersection. Id. Plaintiff claimed the officer told her to remove her pants and underwear, she complied, and that the male officers laughed and pointed at her when her pants were down. Id. at 1087. No marijuana was found on plaintiff. Id. The plaintiff sued the MPD asserting federal and state constitutional claims and statutory and tort claims from what she alleged was an unwarranted public strip search. Id. In the Starks opinion Defendant cites, the issue before the court was whether the facts, resolving any factual disputes in favor of the plaintiff party, entitled the defendants to summary judgment based on the doctrines of qualified immunity (federal claims) and official immunity (state claims). Id.

In issuing his opinion, Judge Rosenbaum reviewed the scant law available on on-street strip searches. Id. at 1088. He quoted United States v. Murray: "Ordinarily, when police wish to search the private areas of an arrestee's person incident to arrest, they should first remove the arrestee to a private location—i.e., a private room in the stationhouse." 22 F.3d 1185, 1994 WL 119009, at *1 (D.C. Cir. 1994) (per curiam). The Starks court, however, did not conclude that all outdoor searches were impermissible. In fact, in Starks, Judge Rosenbaum conducted a site visit to the location of the outdoor search. Id. at 1088-89. If all outdoor searches were

13

unreasonable, there would have been no need to conduct a site visit to a location the parties agreed was outdoors.

      Defendant contends that his search was similar to the search conducted in Starks because it was conducted in a parking lot that was at least partially open to public view. (Def.'s Mem. at 7.) The Court finds the facts of the Starks case distinguishable from those present here. First, in Starks, there was no physical sign that the person searched was concealing anything in her pants. Here, Deputy Fleck had reason to believe that Defendant, who had recently sold crack to a confidential reliable informant and who was the subject of a search warrant for his person, was hiding narcotics in his pants as a result of Fleck feeling something unusual during the initial pat down. Second, unlike the manner of the search in Starks, here no evidence has been presented that Defendant's private parts were ever exposed to Fleck, other officers, or the public during the search by Deputy Fleck. Third, the location of the search in Starks was "within restricted sight" of a "major public street intersection." Stark, 6 F. Supp. 2d at 1086, 1089. In contrast, the Court finds that Defendant was searched in a restricted parking lot surrounded by walls or vegetation-covered fences and additional privacy was provided by nearby parked cars. (Doc. No. 30 at 46-51; Def.'s Exs. 4-7.) Further, an officer on the scene testified that he saw no civilians pass by during the search or otherwise observe the search. (Id. at 47.) It is true that officers could have taken Defendant into the precinct building to conduct the search, as they later did to interview him. (Id. at 44.) It is also possible, however, that doing so would have resulted in the destruction or loss of evidence. Moreover, "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of

alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 642 (1983).

Given the totality of the circumstances, the search of Defendant conducted by officers in the rear parking lot of the Fourth Precinct was reasonable. Thus, the Court recommends denying Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 22).

### B.   Motion to Suppress Statements (Doc. No. 21)

The United States Supreme Court has held in Miranda v. Arizona that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The safeguards required are that any time a person is taken into custody for questioning "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. "Miranda holds that [t]he defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly, and intelligently." Moran v. Burbine, 475 U.S. 412, 421 (1986). A valid waiver must be (1) "the product of a free and deliberate choice," and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. "The courts must presume that a defendant did not waive his rights . . . but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). The government "need prove

waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Defendant claims in his motion to suppress statements made to the police that he received an inadequate Miranda warning or did not voluntarily, knowingly, and intelligently waive his Miranda rights. (Doc. No. 21.) The United States represented at the motion hearing that it does not intend to use in its case in chief any statements made prior to the time Defendant was read his Miranda rights at the Fourth Precinct. (Doc. No. 30 at 26.) The Court has listened to the audio recording of the interview with Defendant and finds that Defendant was advised of his Miranda rights at the Fourth Precinct, waived those rights, and any statements made subsequent to his waiver were the product of his free and deliberate choice made with a full awareness of the nature and consequences of his waiver. Finally, because the Court finds that the search that uncovered the drugs on Defendant was permissible, Defendant's argument that the statements made subsequent to that search are fruit of the poisonous tree fails. Thus, the Court recommends denying Defendant's Motion to Suppress Statements (Doc. No. 21).

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1. Defendant's Motion to Suppress Statements (Doc. No. 21) be **DENIED**;

   and

2. Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 22) be **DENIED**.

Dated: February 10, 2006

                      s/ Susan Richard Nelson  
                      SUSAN RICHARD NELSON  
                      United States Magistrate Judge

Pursuant to D. Minn. L.R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by February 28, 2006 a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.