```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                   05-CR-386(JMR/SRN)
```

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Robert Lee Williams | ) | |

Defendant moves to suppress the fruits of a claimed unconstitutional search, and subsequent unconstitutional interrogation based upon that search. A Magistrate Judge issued a Report and Recommendation denying defendant's motions on February 28, 2006. Defendant timely objected to the Report and Recommendation, pursuant to Local Rule 72.2(b).

Based upon a de novo review, the Court declines to adopt the Report and Recommendation and grants defendant's motions.

I. Factual Findings

The Court does, however, adopt the following portions of the Magistrate's factual findings:

> On Tuesday, October 25, 2005, during daylight hours and prior to searching Defendant's house, officers of the [Minneapolis Police Department ("MPD")] observed Defendant leaving his house. They followed Defendant for a number of blocks and then pulled him over on a busy street. Defendant was patted down for weapons and then handcuffed. None were found. Agent Olson testified at the motion hearing that at least one of the officers who patted down Defendant, Hennepin County Deputy Erik Fleck, "found something in [Defendant's] pants; however, short of pulling his pants down on the street and searching for it there was no way of getting it out." Upon cross-examination, Olson stated that he had read Deputy Fleck's report of his involvement in the events of October 25, 2005 and that the report did not describe feeling a bulge in Defendant's pants. Olson testified that an MPD

sergeant suggested that Defendant be removed from the scene of the traffic stop to the MPD's Fourth Precinct so that a full search could be conducted. Olson testified that "[a]t the arrest scene he was patted down and the officer felt there was something in his pants; however, because of privacy issues he did not want to go in the pants at that location."

Defendant was placed in a squad car and transported to the Fourth Precinct which was located several blocks from the scene of the traffic stop. He was taken into the rear lot of the Fourth Precinct—the parking lot for squad cars and precinct employee vehicles. There, in the Fourth Precinct parking lot, Defendant was taken out of the squad car and again searched by Deputy Fleck. A significant part of the testimony of Olson and Defendant centered around the description of the parking lot and Defendant's location in the parking lot when he was searched. Defendant entered into evidence several pictures, four of which depict the rear parking lot from different vantage points as photographed on December 22, 2005, approximately two months after the date of the search. The parking lot is enclosed by the back of the precinct building, a brick wall, and a chain link fence topped with barbed wire. The rear parking lot is bordered by residential housing. The parking lot has one gated entrance/exit. There was no testimony as to whether or not the gate was closed during the search of Defendant. The pictures taken by counsel for Defendant on December 22, 2005 show the gate open.

Agent Olson testified that he stood about ten feet from Fleck during the search but "was also being talked to by several cops" during the search. Olson testified that the vegetation on the fence surrounding the parking lot was "more thick" at the time of the search than that depicted in the photographs. He stated that there was very thick vegetation on the fence covering nearly every inch of the fence perimeter. He stated that, during the search of Defendant in the parking lot, he saw no cars drive by or people walk by the parking lot. Other than Defendant, Olson saw no civilians or nonpolice officers in the parking lot. Olson testified that he could not recall what Fleck said to Defendant or if Fleck asked Defendant's permission to conduct the search. Olson testified that Fleck undid Defendant's pants, put his hand into Defendant's pants and inside Defendant's underwear and retrieved a large amount of crack cocaine

and powder cocaine from somewhere near Defendant's genitals.

Defendant testified that he put the drugs in his pants to hide them in the event he was searched. At the hearing, he marked an "X" on Defendant's Exhibit 5 to mark his location in the parking lot at the time of the search. The location Defendant marked is near the entrance/exit to the parking lot. Defendant testified that the "parking lot was full when we pulled in there." He stated that he was searched "right where the squad car was parked." Upon direct examination, the following exchange occurred between Defendant and his counsel:

Defendant:   The Officer got me out of the car, brought me around to the back of the car, they took the cuffs off and he proceeded to search me. He searched me, he went down ... my arms and he turned me around, he took his hand and went around my waist, his two thumbs was going around my waist and he pulled my pants open and stuck his hand down my privates.

Counsel:   Did you give him permission to do this?

Defendant:   No, I didn't.

Counsel:   Did he ask for permission?

Defendant:   No permission.

Counsel:   Did he unbutton your pants?

Defendant:   No, he ripped the button loose.

Counsel:   Where did his hand go when he went down into your crotch?

Defendant:   Down in my underwear under my testicles.

Olson testified that immediately after the search, Defendant was taken into the precinct building where he was later interviewed by Officer Sosnowski. No testimony was provided as to why the search was conducted in the parking lot rather than the precinct building.

> Officer Sosnowski testified that he interviewed Defendant for about ten minutes in a small room off one of the basement offices "probably a couple of hours" after Defendant had been taken into custody. After preliminary questions about his age, address, and other contact information, Sosnowski read Defendant his Miranda rights. Defendant agreed to talk with Sosnowski without an attorney. Defendant admitted he had been selling drugs in Minneapolis for over a year and had possessed crack and powder cocaine on his person when he was stopped by police on October 25, 2005.

Magistrate Judge's Report and Recommendation at 3-7 (citations omitted).

Defendant claims he was subjected to an unreasonable search in violation of the Fourth Amendment. He seeks to suppress the crack and powder cocaine seized from inside his underclothing. He further asks the Court to suppress his subsequent statements as fruit of the poisonous tree, arguing that the evidence and statements are linked. Defendant's analysis is correct; the evidence and statements shall be suppressed.

II. <u>Analysis</u>

   A. <u>Search of Defendant's Person</u>

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, . . . against unreasonable searches and seizures." U.S. Const. amend. IV. While strip searches, or searches of a person's private parts, are not per se illegal, the reasonableness of such a search depends on the circumstances. These may include "the scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979).

Legal consideration of strip searches is scanty, but a review of reported cases shows the inquiries are fact-intensive and fact-specific. There is no question that, on these facts, there was probable cause to search defendant. Deputy Fleck properly patted defendant down upon apprehension. His pat-down appeared to reveal something suspicious in defendant's pants. The officers then brought defendant to a different location to conduct an in-depth search. To this point, the officers' conduct fits neatly within the Fourth Amendment; but subsequent events do not.

The officers apparently recognized that reaching into a suspect's pants and about his genitalia on a public street was inappropriate – as attested by Agent Olson at the suppression hearing. Recognizing this, the Minneapolis officers moved him to a less public location. But while perhaps less public, their precinct parking lot cannot be considered private.

This search occurred during daylight hours. Regardless of vegetation growing on a surrounding fence (and the Court recognizes that autumn's leaf-drop occurs far earlier than October 25 in the city of Minneapolis), the parking lot is bordered by residential housing. It can be seen and observed by passers-by as well as the occupants of those homes. While the officers denied the presence of observing civilians in the area, the immediate absence of

civilian on-lookers is not conclusive when determining the degree of privacy in a particular locale. Courts have recognized that merely being "subject to viewing by . . . the public" diminishes the degree of privacy. Amaechi v. West, 237 F.3d 356, 361 (4th Cir. 2001).

The officers have not suggested, and the Court cannot imagine, any exigent circumstances requiring them to conduct this search in the parking lot rather than in the precinct building – only steps away. A pat-down had already established that defendant was unarmed. Further, he was surrounded by police officers, had displayed no tendency to fight or to flee, and did not resist arrest. He had been hand-cuffed. Officers removed the cuffs of their own volition. Transport had been completed. The officers were in no danger.

As for any suggestion of possible loss or destruction of evidence, the Court finds this unlikely in the extreme. How could a person in those surroundings have done so? And how is this imagined-destruction more likely in the parking lot, rather than in the precinct house? This argument falls of its own weight.

Defendant cites Starks v. City of Minneapolis, 6 F. Supp. 2d 1084 (D. Minn. 1998), in support of his argument that this outdoor search was unreasonable. Starks was a civil action involving the claimed search of a female passenger in a lawfully-stopped car. Id. at 1086. The Starks officers smelled burnt marijuana in the

6

car, and conducted a pat-down of the auto's occupants, finding none. Id. Later, the officers overheard Starks say the police had not found "it." Id. Starks claimed a female officer removed her from the stopped vehicles, took her behind a tree, but within restricted sight of a busy intersection. Id. Starks said she was instructed to remove her pants and underwear. She complied; no marijuana was found. Id. at 1087. The ruling was clear: when a detainee had been secured, and travel to a station-house was possible, an on-street intimate inspection was an unconstitutional, unreasonable search.

The Starks rationale applies here. It is no distinction that in Starks the officers felt nothing on or under the detainee's clothing, as opposed to these facts where Deputy Fleck felt something during the pat-down. There is no logical distinction between physical, verbal, and visual cues which might establish probable cause. In Starks, as here, officers believed the suspect had contraband concealed in or under clothing. In that essential respect, the cases are the same.

In Starks, the detainee was subject to a full visual strip search. Here, Mr. Williams underwent manual manipulation of his underwear and his genitalia in a location subject to public observation, without the meanest suggestion of exigence. The Court is not persuaded that a visual strip search requires more privacy than a manual search of genitalia. Both here, and in Starks, a

minimal respect for the subject's privacy compels the conclusion that the search was unconstitutional.

Finally, the Court rejects the suggestion that <u>Starks</u> can be distinguished because that search occurred in a place "within restricted sight" of a "major public intersection," while in this case it appears some fence vegetation surrounding the precinct's parking lot may have provided some cover. A parking lot, by its very nature - people moving about and cars driving in-and-out through an opening wide enough to accommodate them – lacks the fundamental privacy required before administering an intimate body search.

A claim that this was a police parking lot, thereby justifying the search, which could just as easily and safely have been conducted in private only a few feet away within the precinct station, is a tissue which will not support the constitution. The officers' testimony denying that anyone other than the police actually saw the search is not a constitutional cure.

The government argues that a search's reasonableness does not depend on the existence of less intrusive measures, citing <u>Illinois v. Lafayette</u>, 462 U.S. 640, 647 (1983). In <u>Lafayette</u>, the court found it reasonable for police to inventory all property found on the person of one about to be jailed. <u>Id.</u> at 646. The court held that as long as the governmental interest outweighed the intrusion into privacy, there is no need to consider the existence of less

intrusive measures. <u>Id.</u> at 647. The Court does not consider it trivial that <u>Lafayette</u> did not involve an intimate search of a person's body which could be observed by the public. By the court's own words in <u>Lafayette</u>, it was not seeking to dictate what procedures should be followed, but to determine "whether the Fourth Amendment *requires* such steps." <u>Id.</u> (emphasis in original).

The present case is easily distinguished. This was an intimate body search in which an extra step was required. The Court finds this intimate intrusion upon the detainee's privacy outweighs the governmental interest in the immediacy of the search. Under these circumstances, the availability of a more private location - at almost no distance away - is quite relevant to the reasonableness of the search.

The Court need not consider, nor does it hold, that all outdoor strip searches are unreasonable. With effort, the Court can conceive of rare circumstances, perhaps involving an unusually secluded locale, or the threat of a deeply concealed weapon, or unusual risk to officers, which could square with the Constitution. But this case falls far short of these conceptions.

This was a deeply invasive bodily search, conducted during daylight hours, in a parking lot susceptible to public view, mere yards from the privacy of the precinct station building. The Fourth Amendment protects against unreasonable searches. As a result, the Court finds this search was not reasonable under the

totality of the circumstances.

    B.   <u>Defendant's Statements</u>

Following the search, officers brought defendant into the precinct building for questioning. After a Miranda warning, the officers questioned defendant about the drugs recovered during their search. Defendant answered the questions. The officer's questions, and defendant's statements, flowed directly from the impermissible search.

Verbal evidence which derives immediately from an unlawful search is tainted by the unlawful search and must also be excluded. <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963); <u>Taylor v. Alabama</u>, 457 U.S. 687, 690 (1982). Defendant's statements followed directly after the search, and there is no evidence of any intervening action which could purge the constitutional defect. The statements are directly related to the evidence seized by the officers, and both must be excluded.

III.  <u>Conclusion</u>

For the reasons set forth above, and based upon a <u>de novo</u> review of the record, the Court rejects the Magistrate's Report and b Recommendation [Docket No. 32]. Defendant's motions to suppress evidence and statements are granted.

Accordingly, IT IS ORDERED that:

1. Defendant's motion to suppress statements [Docket No. 21] is granted.

2. Defendant's motion to suppress search and seizure evidence [Docket No. 22] is granted.

Dated:  May <u>4</u>, 2006

<u>s/James M. Rosenbaum</u>  
JAMES M. ROSENBAUM  
United States Chief District Judge